IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LINDA C. SCALLY,

            Plaintiff,

vs.                                                        Civ.  No. 99-1419 BB/RLP

KENNETH S. APFEL,
Commissioner of Social  Security,

            Defendant.

UNITED STATES MAGISTRATE JUDGE'S
ANALYSIS AND RECOMMENDED DISPOSITION[1]

1.      Plaintiff, Linda Scally, (Plaintiff herein), filed an application for Disability Income Benefits

(DIB) under Title II of the Social Security Act on July 10, 1997.  Her  application was denied

administratively, and by an administrative Law Judge (ALJ) on May 15, 1998.  Plaintiff appealed the

denial of benefits to the Appeals Council.  The Appeals Council declined to review the ALJ's decision

on November 4, 1999.  The matter  now before this Court is Plaintiff's Motion to Reverse the

decision of the Commissioner denying her application for benefits.

I.      **Standard of Review**

2.      This Court reviews the Commissioner's decision to determine whether the records contain

substantial evidence to support the findings, and to determine whether the correct legal standards

were applied.  **Castellano v. Secretary of Health & Human Services**, 26 F.3d 1027, 1028 (10th

Cir.1994).   Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as

_____

[1]Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations.  A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

adequate to support a conclusion.' " **Soliz v. Chater**, 82 F.3d 373, 375 (10th Cir.1996) (quoting **Richardson v. Perales**, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).   In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute our discretion for that of the Commissioner, but I have the duty to carefully consider the entire record and make my determination on the record as a whole.   **Dollar v. Bowen**, 821 F.2d 530, 532 (10th Cir.1987).

3.      The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled.   **Reyes v. Bowen**, 845 F.2d 242, 243 (10th Cir.1988).    If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there.   **Sorenson v. Bowen**, 888 F.2d 706, 710 (10th Cir.1989).   The burden of proof is on the claimant through step four;  then it shifts to the Commissioner.   **Id.**

**II.      Vocational and Medical Facts**

4.      Plaintiff was born on February 5, 1954.  (Tr.264).  She has a GED and relevant work experience as an electronics assembler and dispatcher.  (Tr. 13, 96).   She was awarded disability benefits in 1991.  (Tr. 267).  Benefits were terminated effective  March 1997.  (Tr.  268).  She did not appeal the termination of benefits.  (Id.)  The application for benefits relevant to her present claim was filed on July 10, 1997, and  alleged a date of onset of disability of July 1, 1997.  (Tr. 44-46).

**A.      Evidence of Medical Care from 1979 through June 30, 1997**

5.      Plaintiff was awarded disability benefits in 1991 due to recurrent, metastatic melanoma.  (Tr. 267).   The cancer, which was originally located on her left deltoid, spread to her right leg, groin, pelvis, and to "little melanomas"  all over her body.(Tr. 113, 170,  246, 188).  Prior to March 1991, she was treated with chemotherapy, radiation therapy and  *Interferon*.  (Tr. 135).

6.      Plaintiff developed a severe pain syndrome in 1991, initially felt by be related to her cancer.

(Tr. 135).  Her treating oncologist, Dr. Mitchell Binder of Lovelace Medical Center,  referred to a pain clinic (Tr. 134) where she received myofacial trigger point injections.  (Tr. 132).  Dr. Binder also prescribed medication for complaints of vertigo. (Tr. 113,129).  By August 1991 Plaintiff complained of continued vertigo and dizziness,  headache, numbness in her left arm and areas of pain in both calves, lower abdomen, low back and both breasts. Dr. Binder was unable to find any adenopathy, and suggested that depression was contributing to her symptoms.  She reacted negatively to this suggestion.  By November 1991 Dr. Binder stated diagnosed increasing pain syndrome.  (Tr. 127).  When clinical work up revealed no anatomic basis for Plaintiff's complaints of pain he again recommended mental health consultation.  Plaintiff refused, electing use of pain medication instead.  (Tr.  122).  She also failed to keep an appointment with a specialist to work up her complaints of vertigo.  (Tr. 115).

7.      Dr. Binder continued to monitor Plaintiff for recurrence of cancer, and continued to suggest that she obtain treatment for depression to address her pain complaints.  (106-109, 111-113, 106, 102).  Although she remained cancer-free (Tr. 174), he felt that underlying depression was impacting her pain complaints. (Tr. 102).  By August 1994, Plaintiff was taking *MS-Contin*[2] twice daily for pain control.  An antidepressant, *Amytriptyline*, had been discontinued because it caused her to be "out of it." [3] (Tr. 175).

8.      In January 1995 Plaintiff complained of increased pain throughout her body, pain in her eyes

---

[2]*MS-Contin* is a  controlled-release oral morphine formulation indicated for relief of moderate to severe pain.  It is used in patients who require repeated dosing with potent opioid analgesics over periods longer than a few days.  **1999 Physicians Desk Reference** at 2556-2559.

[3]In a subsequent history, Plaintiff stated that she had difficulty with *Amytriptyline* because of its interaction with her narcotic (Tr. 188), presumably *MS-Contin.*

and sinuses, along the left side of her head, inability to sleep on her left side, shortness of breath with minimal exertion, bad dreams, continued vertigo and rectal bleeding.  She also disclosed that she was utilizing marijuana to stimulate her appetite.  Her physical examination was basically normal, except for extreme pain in her right calf on palpation.   Dr. Binder could not explain Plaintiff's multiple pain complaints, stating that if the cause of pain was metastatic disease, Plaintiff would have died by that time.  He urged her to consult with her primary care doctor, Dr. Hickson, to see if Dr. Hickson could help with Plaintiff pain syndrome "and to see if we can get the focus off melanoma, for right now, since it seems that something else must be the cause of her symptoms."  (Tr. 173-174).

9.       Plaintiff returned to Dr. Binder in August 1995, distressed and tearful, stating that a drug element in her neighborhood was putting pressure on her.  He felt this had exacerbated  her somatic complaints, which now included a ticklish sensation around her lips, bouts of rectal bleeding, sharp pains behind her left eye, bad dreams, shortness of breath, a heavy sensation in her chest, and charlie-horse cramping of her right leg.  Again, physical examination revealed little.  Dr. Binder  stated that Plaintiff's pain complaints did not appear to be directly related to her cancer, and may be part of a pain syndrome. Plaintiff was not interested in counseling, however, and rejected further work up of her complaints of rectal bleeding.  Dr. Binder scheduled Plaintiff for a return visit in four months, and refilled her prescription opioid pain medication, limiting her to two tablets per day.  (Tr. 168-169).

10.      Plaintiff returned to Dr. Binder in January 1996 with slightly abnormal lab tests, suggestive of possible liver metastasis.  CT of the abdomen and pelvis, however, were normal.  (Tr. 199, 201).

11.      Plaintiff was evaluated on January 17, 1996, by Stephen I. Sachs, PhD.[4]  After taking an

[4]It appears that Dr. Sack's evaluation was obtained as part of a periodic review of Plaintiff's entitlement to disability benefits, and was a basis for termination of those benefits pursuant to 20C.F.R. §404.1593-1595 and 20 C.F.R. §416.993-995.

extensive history and conducting a thorough  mental status examination, Dr. Sack's reached these

conclusions:

Axis I:  Major affective disorder, single episode.  The claimant is currently on an antidepressant (*Zoloft*).  She states that she is having some vegetative signs of depression involving nightmares or intermittent insomnia, as well as anxiety.  She denies any counseling.  She states that she was briefly evaluated during some of her Lovelace admissions by some type of mental health worker.  There was no follow-up.  She does state that she is getting some relief of her anxiety with her *Zoloft*.

Axis II:  Passive dependent personality.

Axis III:  Malignant metastatic melanoma.

Axis IV:  Psycho social stressors - three

Axis V:  General level of function in the last year and currently is about 75[5].

Clinical Impressions:  (She) seems to be able to relate to others.  She is also able to understand and follow simple instructions.  I would expect that she could maintain the attention required to perform simple and repetitive tasks.  Nevertheless, her analgesic medication (*MS-Contin*) does cause sedation and could interfere with some attention requiring activities depending on dosage.  (She) would have some difficulty in dealing with the stresses and pressures associated with day-to-day work activities.  This would be compounded by marijuana usage and narcotic usage (*MS-Contin*).  I consider her impairment to be moderate.

Prognosis:  Strictly in regards to her clinical depression, I do expect that this would be less of a problem if the patient was involved with regular individual psychotherapy to deal with her anger in regards to her medical care and her cancer diagnosis, and would also help in terms of dealing with secondary gain from her illness, from which she is currently receiving a great deal.  I would expect with psychotherapy the depression would be alleviated within a twelve-month period.

(Tr. 191-192).

---

[5]A GAF of 75 is described as follows:  "If symptoms are present, they are transient and expectable reactions to psycho social stressors (e.g., difficulty concentrating after family argument) no more than slight impairment in social, occupational or school functioning (e.g., temporarily falling behind in school work." **Diagnostic and Statistical Manual of Mental Disorders (4th Ed.)** p. 32.

12.      Plaintiff returned to Dr. Binder in June and July of 1996 complaining of recurrent vertigo, increased bilateral leg pain, pains behind her eyes, rectal bleeding and lower abdominal pain.  MRI evaluation showed no evidence of recurrent disease.   Dr. Binder felt her leg pain was neuropathic in nature, and  recommended use of *Capsaicin*, a topical analgesic[6], which she declined.  She was scheduled for a return visit the following December.  (Tr. 196, 198, 200).

13.      Plaintiff was next evaluated at the University of New Mexico Hospital emergency room on January 2, 1997, stating that she had been suddenly cut off from benefits at Lovelace[7].  (Tr. 255). She complained of chest and abdominal pain, body aches and headache, and stated that she was going through withdrawal from *MS-Contin*.  She was treated with *Percocet* and Aspirin, and referred to the UNM Cancer Research and Treatment Center, where she was seen on January 27, 1997. At that evaluation  she stated that she had not taken *MS-Contin* since July 1996 because she could not pay for the medication.   She reported using street drugs, including marijuana, *Valium* and *Percocet* for pain control.   Plaintiff was described as in "some amount of distress, secondary to her pain," teary eyed and reserved in affect.  Her physical examination was "mostly unremarkable."  She was given a prescription for *Tylenol #3*.  (Tr. 256-257).

14.      Plaintiff returned to Lovelace and Dr. Binder on March 17, 1997, after her health insurance was reinstated.  (Tr. 194).  She told Dr. Binder that she had not taken *MS-Contin* since last refilling that prescription the prior December, a history different than that given at the UNMH emergency room.  She complained of "terrible, generalized pain and points" particularly in her right shoulder,

---

[6]**See** 1999 Physicians' Desk Reference, p. 767.

[7]Plaintiff had health insurance benefits through her former employer.  The reason for the termination, and later subsequent reinstatement , of health benefits is not apparent from the administrative record.  (Tr. 194, 256-257)

the left side of her head and her right leg.  She admitted abusing alcohol and cannabinoids, and to being depressed.  Physical examination was again unremarkable.  Dr. Binder noted that Plaintiff had had no recurrence of melanoma for 6 ½ years, and that there was no clear explanation for her generalized pain.  He again referred her for a mental health evaluation to determine if she needed "more aggressive therapy for depression, since she is not receiving either counseling or anti-depressant therapy." (Tr. 194-195).  He did not renew her prescription for *MS-Contin.*  (Tr. 194).  She was scheduled for a return visit in September 1997.  (Tr. 51).

15.     Plaintiff initiated mental health counseling with Philip Reed, Ph.D., in April 1997.  (Tr. 217-220).  She complained of chronic right shoulder pain, pain at various points in her body, vertigo and family stresses.  She admitted to using street drugs, frequent alcohol consumption in order to sleep, and daily use of marijuana to help with nausea.  She also stated that she had recently been advised that her Social Security Benefits would be terminated, and that she would need to reapply for benefits or find work.  On examination, Plaintiff was tearful and displayed many pain behaviors.  She admitted to depression, but denied ever having been suicidal.  She was oriented, but rather distractible.  On mental status examination, Plaintiff's memory was intact, her processing speed was normal, speech articulate and fluent, and her stream of thought was logical but labile. She had no apparent hallucinations.  Dr. Reed felt that Plaintiff had developed chronic pain following development of melanoma, as well as emotional suffering which exacerbated her pain.   She had developed maladaptive chronic pain behaviors, including alcohol abuse, daily use of marijuana and a limited lifestyle.  Her motivation was described as "moderate."

16.     Plaintiff returned to Dr. Reed on two occasions for therapy.  On April 10, 1997, he noted that she was resistant to giving up alcohol and drugs, and did not "differentiate between emotional pain,

suffering and emotional distress, and her actual physical pain and physical disabilities." (Tr. 216).

On April 17, 1997, Plaintiff came to her appointment with Dr. Reed high on marijuana. She was

resistant to any attempt to alter her thought processes in terms of mental health therapy. Dr. Reed

suspended counseling, stating:

> I have suggested to her that unless she is willing to try to give up alcohol and to come
> to appointments not intoxicated with marijuana, that we would likely not make any
> progress. She is presently unwilling to do this, and insists that it is a necessity in
> dealing with her pain. Consequently, we will terminate therapy at this point.

(Tr. 214-215).

17.     Charles McGrath, M.D., became Plaintiff's primary care provider in June 1997, replacing Dr.

Hickson. (Tr. 208-209, 212). Plaintiff told Dr. McGrath that she hurt "all over," but complained

particularly of right shoulder pain and an inability to abduct her shoulder. On examination, she had

some tenderness on the shoulder and limited range of motion. X-ray of her shoulder demonstrated

early degenerative changes. Dr. McGrath diagnosed chronic pain, melanoma, right shoulder pain

and myalgias, and prescribed *Tagamet* and *Relafen*[8]. He also advised that she be followed up in the

Pain Clinic, but she was not receptive to this recommendation, stating that she had tried that before,

and it had not helped.

### B.     Evidence of Medical Care after Plaintiff's Alleged Date of Onset,  July 1, 1997.

18.     Plaintiff was seen by Daryl Smith, P.A., on July 10, 1997. Her treating physician, Dr. McGrath

was on vacation. (Tr. 207, 53). She  complained of an enlarging lump on her left leg. (Tr. 207).

X-ray of the leg  was unremarkable. (Tr. 210).   Mr. Smith referred Plaintiff for surgical evaluation.

---

[8]*Relafen* is an NSAID, used to treat signs and symptoms of osteoarthritis and rheumatoid arthritis.
**1999 Physicians' Desk Reference**, at 3085-3087. This was subsequently changed to *Indomethicin,* (Tr. 207,
76) another NSAID. **Id**. at 1812.

There are no further records of medical care in the administrative file; however, Plaintiff did not mention, in testimony or written documentation, any surgical work up of a lump on her leg.[9]

19.     Two non-examining psychologists evaluated Plaintiff's medical records in the course of agency review of her claims.  The first non-examining psychologist found that Plaintiff's mental impairments of somatiform disorder and substance abuse were not severe.  (Tr. 223-231).  The second non-examining psychologist found Plaintiff's mental impairment to be "severe." though not of listing level severity.  (Tr. 232).  In arriving at a residual functional capacity assessment, the second non-examining psychologist supported her opinion with the following explanation:

> 43 y.o. female w/ ongoing cannabis dependence & alcohol abuse.  Clmt. c/o constant/chronic severe pain w/ no medical explanation.  She is unwilling to decrease or abstain from cannabis or alcohol use in order to facilitate treatment intervention.  CPP (concentration, persistence, pace) problems are secondary to marijuana use for self-medication with no intrinsic cognitive deficits noted.  Probable personality d/o (disorder) comorbid with substance abuse/dependence.
>
>   DX:   Chronic pain d/o (disorder) associated w/ general medical condition and psychological factors.
>          Cannabis dependence
>          Alcohol abuse.

Main problem is substance abuse.  Clmt. capable of routine work when sober.

(Tr. 243)

20.     At the close of the administrative hearing, the ALJ asked the Plaintiff's representative if there was any reason not to close the record.  The representative stated that there was not, that no

---

[9]Plaintiff gave conflicting information as to whether she obtained additional medical care.  In a Reconsideration Disability Report submitted in October 1997, Plaintiff did not list any doctors seen since her claim for disability had been filed (July 10, 1997).  (Tr. 88; 44-46).  In a Request for Hearing submitted prior to her hearing before the ALJ, she indicated that she had received no medical treatment since October 1997. (Tr. 91-92).  In a document submitted on April 13, 1998, she stated that she had an appointment for a melanoma check up on "the 20th," presumably April 20, 1998, one week before her hearing before the ALJ, and she listed new medications prescribed for her at Lovelace in March and April 1998.  These medications were for pain relief and  a muscle relaxant.  (Tr. 94).

additional information was expected. (Tr. 299).

### C.    Plaintiff's testimony

21.    Plaintiff alleges disability due to chronic pain throughout her body caused by malignant melanoma and arthritis, vertigo and menopause.  (Tr. 50).   At her administrative hearing on April 27, 1998,  Plaintiff testified that she engaged in essentially no activities.  She did little cleaning, did not go out in the sun, spent her days with her feet up because of leg pain (Tr. 269),  could lift a gallon of milk using two hands, walk a maximum of 15-20 minutes at a time,  had to frequently change positions when sitting  (Tr. 288), could not climb stairs, could not kneel or squat too much (Tr. 289), had difficulty sleeping because of pain (Tr. 290), had difficulty with memory and concentration, especially when having an attack of vertigo, and was depressed despite use of *Zoloft*.  (Tr. 291).   She also testified that she had not had a drink in two years, continued to smoke marijuana when stressed or at a party, having last smoked two weeks earlier.  (Tr. 275-276).    She stated that she was currently seeing Dr. Binder, who had prescribed a muscle relaxant for her. (Tr. 277).

### III.    Vocational Testimony

22.    The following hypothetical questions[10] were posed to a vocational expert ("VE" herein) at the administrative hearing.

Hypothetical #1:  Assume an individual of Plaintiff's age (44) and education (GED), the ability to lift 20 pounds occasionally, 10 pounds frequently, to stand and sit six hours in eight with normal breaks, who was limited to simple, routine work.  The VE testified that this individual could not do any of Plaintiff's past work as she described it, but could perform the

---

[10]Additional hypothetical questions were asked by the ALJ.  The ALJ did not rely on the responses to these questions in making his findings.  Accordingly, they will not be considered here.

jobs of  electronics assembly worker as performed in the national economy, as well as  the

jobs of office helper (DOT 239-567.010; light, unskilled); laundry folder or  laundry spotter

light (DOT 361-684.018; unskilled); assembly production  worker (DOT 706-687.010; light,

unskilled) and parking lot attendant , DOT 915-473.010; light, unskilled).  (Tr. 295-296).

Hypothetical #2:  Assume the same factors, except that standing was limited to fours hours

in an 8 hour day with normal breaks.  The VE testified that this individual could still work as

an assembly production worker, parking lot attendant, officer helper and laundry folder

spotter, because those jobs are light and  allow a sit-stand option. (Tr. 296-297).

23.      The Plaintiff's representative asked the VE to assume additional limitations related to an

emotional disorder, including being teary all the time and unable to deal with people on a daily basis.

The VE testified that such limitations would eliminate all jobs. (Tr. 299).

**IV.      The ALJ's Decision**

24.      The ALJ found that Plaintiff had alleged disability due to chronic pain following radiation and

chemotherapy for carcinoma and multiple melanomas, arthritis and vertigo, and that she suffered from

somatiform disorder.  He held that she did not meet the criteria for a listed impairment under Listing

§13.05 because her cancer had been in remission for at least two years.  He determined that  despite

her impairments Plaintiff retained the residual functional capacity for simple, repetitive light exertional

work that did not require exposure to sunlight.  (Tr. 15, referring to Tr. 24; 223-224; 232).

25.      In considering and ultimately rejecting Plaintiff's testimony regarding the severity of her pain

and functional limitations, the ALJ cited to the following evidence:

        --        The lack of objective findings or signs to account for her complaints of pain (Tr. 14);

        --        Repeated referrals to pain clinics for aggressive therapy for depression and emotional

disorders which she rejected (Id.);

--      Dr. Sacks' January 1996 evaluation which indicated that despite suffering from major affective disorder and passive dependent personality disorder, Plaintiff was able to relate to others, follow simple instructions, maintain attention and perform simple tests, her only limitation being possible difficulty dealing with daily work stresses and pressures.  Dr. Sachs' evaluation further indicated that Plaintiff had a significant history of alcohol and marijuana abuse which would compound her difficulties with day to day work activities, but that with psychotherapy, her mental problems could be alleviated within a 12 month period.  (Id.)

–      Dr. Reed's April 1997 evaluation and attempt at therapy, which indicated that Plaintiff suffered from a pain disorder associated with both physical conditions and psychological factors, but that Plaintiff was unwilling to stop using marijuana and alcohol, making further therapy nonproductive.  (Tr. 14-15).

–      Plaintiff's denial that she abused various substances for self-medication although the record was replete with references to that effect; and

–      Plaintiff's stated symptoms which did not comport to the case histories she provided to various treating and examining physicians in the past;

–      Plaintiff's testimony that her substance abuse was in remission, which  was strongly contradicted by the medical evidence, in that she ceased psychotherapy treatment because of her refusal to abstain from continued abuse.

26.     The ALJ relied on the testimony of a vocational expert to support his finding that Plaintiff could perform the jobs of office worker, laundry folder, production assembler and parking lot

attendant, which existed in significant numbers in the national economy.  (Tr. 16).

## V.     Issues on Appeal

27.     Plaintiff seeks reversal of the Commissioner's decision to deny her benefits, contending:

      A.     The ALJ erroneously failed to develop the record by not obtaining medical records from her date of onset, July 1, 1997, to the date of the administrative hearing;

      B.     The ALJ improperly failed to consider the non-exertional impairments of vertigo, headache and depression;

      C.     The ALJ's credibility evaluation was not supported by the records or the law, and

      D.     The ALJ erred by considering her substance abuse before determining she was disabled.

## VI.    Analysis

### A.     The ALJ did not fail to develop the record.

28.     Plaintiff's claim that the ALJ failed to properly develop the record is without merit.   A claimant is responsible for furnishing medical evidence of claimed impairments, **see** 20 C.F.R. § 404.1512(a), (c), but the Commissioner also has the duty to ensure that an adequate record is developed relevant to the issues raised, **see Hawkins v. Chater**, 113 F.3d 1162, 1164 (10th Cir.1997). Consistent with this duty, §20 C.F.R. 404.1512(d) states that the Commissioner will make "every reasonable effort" to help a claimant get records from his or her medical sources. The ALJ obtained  post-onset records from Lovelace Medical Center. (Tr. 207, 210).  There is no evidence that Plaintiff received any treatment for cancer from her oncologist, Dr. Binder, or from any mental health care provider after her date of onset.  In addition, Plaintiff represented to the Commissioner that she had not had any medical care after her date of onset.  (See footnote 9, *supra).*  Plaintiff's

13

representative advised the ALJ that the record was complete. (Tr. 299).  The ALJ was entitled to rely

on these representations.  **Cf. Hawkins v. Chater**, 113 F.3d at 1167.   Moreover, there is no

indication that Plaintiff or her counsel has ever tried to obtain the medical records she claims the ALJ

should have obtained, which casts considerable doubt on the relevance of the evidence and existence

of any prejudice she may have  suffered from the ALJ's not obtaining them. **See Hawkins**, 113 F.3d

at 1169 (citing **Shannon v. Chater**, 54 F.3d 484, 488 (8th Cir.1995).  Based on these factors, I

conclude Plaintiff has not demonstrated the ALJ violated the duty to develop the record.

> **B.**     **The ALJ gave proper consideration to Plaintiff's non-exertional impairments.**

29.     Plaintiff contends that the ALJ improperly failed to consider the non-exertional impairments

of vertigo, headache and depression.

> **1.**     **Vertigo**

30.     The ALJ did not specifically address Plaintiff's complaints of vertigo.  Before the ALJ need

even consider any subjective evidence of a non-exertional impairment, the claimant must first prove

by objective medical evidence the existence of an impairment, that could reasonably be expected to

produce the alleged disability.  **Cf. Luna v. Bowen**, 834 F.2d 161, 163 (10th Cir.1987) (considering

the non-exertional impairment of pain) ;  42 U.S.C.§ 423(d)(5)(A). There is no objective medical

evidence to support that Plaintiff continued to suffer from disabling vertigo as of her date of onset.

This complaint is not mentioned in Mr. Smith's note of July 10, 1997.  Plaintiff was not taking any

medication for vertigo as of July 10, 1997, shortly after her date of onset of disability, or as of April

14, 1998, shortly before her administrative hearing.  (Tr. 207, 94).

> **2.**     **Headache**

31.     The ALJ acknowledged Plaintiff's subjective pain complaints, including complaints of pain

in her eyes and sinus area (Tr. 14).  He found that there was no objective basis for her complaints of

pain, referring to Dr. Binder's  repeated, unsuccessful attempts to find a physiological basis for her

pain.  (Tr. 14).  Accordingly, the ALJ considered, and rejected, Plaintiff's complaints of headache

pain, and adequately addressed that issue.

### 3.    Depression/Other mental impairments

32.    The ALJ did not find that Plaintiff suffered from depression.  In preparing the Psychiatric

Review Technique form appended to his decision, the ALJ considered three mental conditions:

anxiety related disorders, somatiform disorders and substance addition disorders.  (Tr. 18-21).

Regardless of the label attached to Plaintiff mental impairment, the ALJ was required to consider

Plaintiff's mental impairments in determining Plaintiff's residual functional capacity and in presenting

hypothetical questions to the VE.

33.    The evaluation by Dr. Sacks, an examining psychiatrist, is substantial evidence that Plaintiff,

despite her mental impairments, was capable of understanding and following simple instructions and

maintaining the attention required for simple and repetitive tasks, provided the dosage of her

analgesic medication (*MS-Contin)* did not produce too much sedation.  In addition, although Dr.

Sacks also indicated that Plaintiff would have "some difficulty" dealing with stresses and pressures

associated with day to day work activity,  compounded by her use of marijuana and *MS-Contin*, he

did not state that she was incapable of dealing with work stresses and pressures.  As of her date of

onset and at the time of the administrative hearing, Plaintiff was no longer taking this *MS-Contin*.

34.    The treatment notes of  Dr. Reed, Plaintiff's treating psychologist, are substantial evidence

that   Plaintiff's primary mental impairments were a pain disorder associated with both psychological

factors and a general medical condition, and from substance abuse, and that her attendant  depression,

lability and problems with attention and concentration were caused by marijuana intoxication.

35.     The conclusions of the second non-examining agency psychologist, which are consistent with opinions and observations of Dr. Reed, are substantial evidence that when sober, Plaintiff was capable of performing routine work, despite her chronic pain disorder.

36.     Hypothetical questions presented to the vocational expert must adequately reflect the state of the record. **Gay v. Sullivan**, 986 F.2d 1336, 1341 (10th Cir. 1993); **Hargis v. Sullivan**, 945 F.2d 1482, 1492 (10th Cir. 1991).  In framing the hypothetical questions, the ALJ asked the VE to assume that Plaintiff was limited to work that was simple and routine (Tr. 295-296).  These limitations on Plaintiff's mental ability are supported by the evidence referenced above.

### C.     The ALJ properly evaluated Plaintiff's credibility

37      Plaintiff contends that the ALJ's evaluation of her credibility was not supported by the record or the law.  Although the ALJ accepted that Plaintiff had somatiform disorder, a pain disorder, he found that her testimony as to the severity of the pain was not credible for specifically stated reasons. (See ¶25, *supra*).   The ALJ's credibility determination is afforded considerable deference.  **Gay v. Sullivan**, 986 F.2d at 1339.  Although the ALJ must cite to specific evidence considered in evaluating credibility, **Kepler v. Chater**, 68 F.3d 387, 391 (10th Cir. 1995),  a formalistic factor by factor recitation of the evidence is not required.  **Qualls v. Apfel**, 206 F.3d 1368, 1372 (10th Cir. 2000). I find that the ALJ's rejection of the Plaintiff's credibility is not contrary to the law, was based on substantial evidence and should be upheld.

### D.     Timing of consideration of Plaintiff's drug and alcohol abuse.

38.     The ALJ took Plaintiff's drug and alcohol abuse into consideration before, and indeed without finding her disabled.  Plaintiff contends that  the ALJ erred by considering her alcoholism and drug

abuse arguing in essence, that pursuant to 20 C.F.R. §§1535 (a) and 416.935(a), evidence of substance abuse may only be considered after a finding of disability has been made.  Plaintiff is in error.

> Nothing requires the ALJ, however, to ignore an impairment based upon substance abuse, until he makes a determination of disability.  Only at that time do (the Contract with America Advancement Act of 1996) Pub. L. 104-121 and the regulations direct the ALJ to disregard the substance abuse component.

**Ortiz v. Apfel**, 39 F. Supp.2d 1275, 1283 (D. Kan. 1998)

## VII.    Recommendation

39.    For these reasons, I recommend that Plaintiff's motion to reverse and remand for rehearing be denied, and that the decision of the Commissioner denying Plaintiff's application for benefits be affirmed.

**RICHARD L. PUGLISI**
**UNITED STATES MAGISTRATE JUDGE**

17